IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

RICKY NOBLE,                        )        CASE NO. 1:12-cv-1676
                                    )
                Plaintiff,          )        MAGISTRATE JUDGE
                                    )        KENNETH S. McHARGH
                                    )
COMMISSIONER OF SOCIAL              )        MEMORANDUM OPINION & ORDER
SECURITY,                           )
                                    )
                Defendant.          )

This case is before the Magistrate Judge pursuant to the consent of the parties. (Doc. 13).

The issue before the undersigned is whether the final decision of the Commissioner of Social

Security (the "Commissioner") denying Plaintiff Ricky Noble's application for a Period of

Disability and Disability Insurance benefits under Title II of the Social Security Act, 42 U.S.C.

§§ 416(i) and 423, and Supplemental Security Income benefits under Title XVI of the Social

Security Act, 42 U.S.C. ç 1381 *et seq.*, is supported by substantial evidence and, therefore,

conclusive.

For the reasons set forth below, the Court **AFFIRMS** the decision of the Commissioner.

## I. PROCEDURAL HISTORY

On November 6, 2008, Plaintiff Ricky Noble ("Plaintiff" or "Noble") applied for a Period

of Disability and Disability Insurance benefits. (Tr. 13, 183-186). He then filed for

Supplemental Security Income benefits on September 11, 2008. (Tr. 13, 187-189). Noble

alleged that he became disabled on September 5, 2007, due to illnesses involving nerves in his

arms and legs, and other heart, back and mental conditions. (Tr. 220). Plaintiff's applications for

Disability Insurance benefits and Supplemental Security Income benefits were denied initially

and on reconsideration. (Tr. 80-86, 97-110). Plaintiff filed a written request for a hearing before

an administrative law judge on October 1, 2009.  (Tr. 111-112).  On December 16, 2010, Administrative Law Judge Ken B. Terry (the "ALJ") presided over the hearing from Saint Louis, Missouri via video with a bridge from Plaintiff's attorney's office in Cleveland, Ohio.  (Tr. 13, 31-75).  A vocational expert (the "VE"), Bruce Holderead, also appeared and testified.  (Tr. 13, 22-23, 59-73).

On February 2, 2011, the ALJ determined Noble was not disabled based on the application of the five-step sequential analysis.[1]  (Tr. 13-23).  Plaintiff filed a request for review of this decision by the Appeals Council.  (Tr. 8-9).  The Appeals Council denied the request for review on May 11, 2012, resulting in the ALJ's decision becoming the final decision of the

---

[1]  The Social Security Administration regulations require an ALJ to follow a five-step sequential process determine if a claimant has a "disability" and is entitled to benefits under the Social Security Act.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The Sixth Circuit has outlined the five steps as follows:

(1)  The claimant must show no engagement in substantial gainful activity.  If he is working for profit, then he is not disabled.

(2)  The claimant must show his impairment(s) is severe, thus limiting his ability to do basic work.  If he does not show severe impairment, then he is not disabled.

(3)  Based on medical evidence alone, claimant can show that his impairment meets the specific symptom and functional limitation requirements of one of the nine listings in appendix 1.  20 C.F.R. Part 404, Subpt. P, App. 1 § 12.00.  If this is shown, claimant is found disabled regardless of age, education, or work experience.

(4)  The impairment must prevent claimant from performing past relevant work.  If claimant is able to perform past work he is not disabled.

(5)  The ALJ then has the burden to show that the claimant has the residual functional capacity and vocational factors to perform other work existing in the national economy to determine that he is not disabled.

*Abbott v. Sullivan,* 905 F.2d 918, 923, 926 (6th Cir. 1990).

Commissioner.  (Tr. 1-5).  Pursuant to 42 U.S.C. §§ 405(g) and 1383(c), Plaintiff seeks judicial review of the Commissioner's final decision.

## II.  PERSONAL BACKGROUND INFORMATION

Noble was born on September 4, 1977, and was 30 years old at the time of his alleged onset of disability.  (Tr. 22).  Thus, for Social Security purposes, Noble was considered a "younger individual" (age 18-49).  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  Plaintiff has marginal education.  (Tr. 22).  His past work experience includes the following positions: painter, fork lift operator, warehouse supervisor, towel-rolling machine operator, grinder operator, cashier-checker and fast-food worker.  (Tr. 22, 61-63, 221).

## III.  MEDICAL EVIDENCE[2]

On October 18, 2002, Noble was brought by Emergency Medical Services to MetroHealth Medical Center's Trauma Bay after being removed from an apartment fire.  (Tr. 324-340).  Plaintiff was initially unconscious and was admitted to the hospital for treatment of carbon monoxide poisoning as well as second and third degree burns over 30-60% of his body.  *Id*.  A skin grafting operation was completed to treat back and buttock burns.  (Tr. 327-328).  During his hospital stay, Plaintiff experienced persistent fevers, sinus tachycardia and deep venous thrombosis with inferior vena cava filter.  (Tr. 329-337).

On November 27, 2002, Plaintiff was discharged from the Burn Unit and transferred to the Brain Injury Unit for inpatient rehabilitation, including physical and occupational therapy, due to an anoxic brain injury.  (Tr. 331, 336, 338-340).  Difficulty with Plaintiff's gait and right-sided foot drop were noted.  (Tr. 338).  A neurological exam revealed generalized muscle

---

[2]  The following is merely a summary of the medical evidence relevant to the undersigned's decision.  It is not intended to fully reflect all of the evidence the undersigned took into consideration in reaching its ruling.

weakness and upper motor neuron signs in the lower extremities.  (Tr. 339).  Imaging from December 4, 2002, indicated a normal thoracic spine MRI and a normal brain MRI.  (Tr. 322-323).  Plaintiff was discharged on January 3, 2003.  (Tr. 336-337).

No medical records were submitted from the hospital or any other treatment provider, following Plaintiff's discharge on January 3, 2003 until 2008.  During 2008, Noble was treated numerous times at Fairview General Hospital.  (Tr. 344-369).  On April 22, 2008, Plaintiff reported that he was punched in the mouth and was treated for a lip laceration and broken teeth.  (Tr. 362).  On July 30, 2008, after Plaintiff slipped while going down a ladder, he was treated for back pain and a dislocated finger joint.  (Tr. 351, 358).  An x-ray of Plaintiff's clavicle was unremarkable.  (Tr. 353).  Lumbar x-rays showed minimal disk space narrowing at the lumbosacral junction but was otherwise unremarkable.  (Tr. 354-355).  On October 22, 2008, Plaintiff was treated after he dropped a fridge on his feet going down a step.  (Tr. 346).  X-rays of the right and left foot showed no evidence of acute traumatic abnormality, including no evidence of fracture, subluxation or dislocation and soft tissues were grossly normal.  (Tr. 347).

Noble was treated by Ronald Celeste, M.D., family physician at Westshore Family Practice, from November 5, 2008 to December 24, 2010.  (Tr. 394, 401-403, 550-562, 616-627, 651-675).  Plaintiff reported back and leg pain to Dr. Celeste throughout this time period.  *Id*. MRIs of the cervical and lumbar spine, taken on November 20, 2008, revealed disc bulging at C5-6 and a normal lumbar spine.  (Tr. 295-396, 566-567).  Treatment notes indicate frequent cervical and lumbar muscle spasms and tenderness.  (Tr. 394, 401, 403, 550-560, 562, 616-618, 620-622, 626-627, 651-657, 659, 661-673).  Treatment notes further report that Plaintiff's pain was well-managed with medication.  (Tr. 552, 558, 617-618).

On November 5, 2008, Dr. Celeste requested a psychiatric evaluation for Plaintiff due to Post Traumatic Stress Disorder ("PTSD") and panic attacks.  (Tr. 394, 445).  Noble was initially evaluated by Samuel A. Nigro, M.D. on December 18, 2008.  (Tr. 446).  Dr. Nigro documented diagnoses of PTSD and Panic Disorder as well as symptoms including mood swings, somatization, anxiety, pain, depression, concentration, and suicidal tendencies.  *Id*.  He indicated that Plaintiff was struggling, unstable and in crisis with moderate risks.  *Id*.  Noble continued to be treated by Dr. Nigro through December 7, 2010.  (Tr. 716-720).

Dr. Nigro's additional treatment notes reference a diagnosis of Bipolar II Disorder on January 6, 2009.[3]  (Tr. 449).  Treatment notes further indicate average intellect, insightful judgment, on-point attention span and concentration, and no direct assessment of memory.  (Tr. 446, 457, 717-720).  Throughout the record, Dr. Nigro reported Plaintiff's Global Assessment of Functioning ("GAF") score as varying between 50 and 60.  (Tr. 446, 449, 717-720).  Records further indicate Plaintiff's progress fluctuated from marginal to adequate to good, and from unstable to stable.  *Id*.

Dr. Nigro also completed a mental function questionnaire for the Bureau of Disability Determination ("BDD").  (Tr. 410-412).  Dr. Nigro documented descriptors of anxiety, panic, depression, and mood disorder with specific diagnoses listed as PTSD and Panic Disorder.[4]  *Id*. He indicated that Plaintiff's cognitive status was intact, but described Plaintiff's daily activities as erratic and unpredictable.  *Id*.  Dr. Nigro also opined that Plaintiff's response to treatment varied from adequate to unstable.  *Id*.  The doctor also found that Plaintiff had a poor ability to

---

[3]  Dr. Nigro's medical records are scarce and generally illegible.

[4]  Bipolar II Disorder was not referenced by Dr. Nigro on the mental function questionnaire, he only referenced 309.81 and 300.01 (PTSD and Panic Disorder in the DSM-IV-TR).  American Psychological Association, *Diagnostic & Statistical Manual of Mental Disorders* (4th ed., text rev. 2000).

handle stress, but was otherwise capable of managing a potential benefit payment.  *Id*.

Mitchell Wax, Ph.D., a psychologist, completed a consultative evaluation of Plaintiff through a clinical interview on January 21, 2009 for BDD.  (Tr. 423-428).  Dr. Wax indicated diagnoses of Bipolar Disorder, Intermittent Explosive Disorder, Malingering, and Personality Disorder, NOS.  (Tr. 427).  During the evaluation, Plaintiff reported the he was under psychiatric care for anger and crying spelling, experienced flashbacks from the fire, could not work due to anger issues and medical problems, did not like to leave the house, and believed he was capable of living independently.  (Tr. 423-428).

Dr. Wax concluded that Plaintiff's ability to relate to others was markedly impaired due to his anger and being emotionally liable, and found Plaintiff would have difficulty working with others on a job.  (Tr. 426-427).  Plaintiff's mental ability to understand, remember, and follow instructions was not impaired.  (Tr. 427).  Noble's mental ability to maintain attention, concentration, and persistence was mildly impaired; however, Plaintiff was able to focus and attend during the evaluation.  *Id*.  There was no evidence of mental confusion and Plaintiff demonstrated a good memory.  (Tr. 425).

Dr. Wax also noted that Plaintiff complained of back pain, but did not appear in pain during the evaluation.  (Tr. 427).  In addition, Plaintiff stated that he had panic attacks three to four times per week, yet Dr. Wax could not make a diagnosis of a panic disorder based on Plaintiff's description of his panic attack.[5]  (Tr. 425).  Dr. Wax also noted that Plaintiff would not or could not provide clear information about how he obtained money to live; was difficult to interview at times; intermittently appeared to be withholding information; did not provide

---

[5]  Dr. Wax reported Plaintiff's description of a panic attack as: "his mind goes blank, he gets angry, and goes into a rage. [Plaintiff] stated that at these times he yells and screams." (Tr. 425).

specific information about how he spends a typical day; exhibited a sense of entitlement (noted grandiosity); demonstrated paranoid ideation; and appeared angry and sad during the evaluation. (Tr. 423-427).

On January 23, 2009, Plaintiff underwent surgery to repair calluses and a hammertoe on his right foot.  (Tr. 434-443).  Podiatrist Stanley Beekman noted that Plaintiff had typical symptoms and pain with the condition corrected by surgery.  (Tr. 384).  Dr. Beekman also reported that Plaintiff had an antalgic gait but no motor loss, muscle weakness or reflex abnormalities.  *Id.*  An evaluation at Fairview Hospital from the day of surgery found skin grafts well-healed and his neck was supple with good range of motion (Tr. 438).

Kevin Edwards, Ph.D. completed a Mental Residual Functional Capacity Assessment on February 17, 2009.  (Tr. 472-475).  Dr. Edwards stated that psychiatric records in the file were sparse and illegible.  (Tr. 474).  He gave weight to Dr. Wax's opinions and referenced information from Dr. Wax's evaluation.  *Id.*  Based on the medical evidence of record, Dr. Edwards opined that Plaintiff was able to perform simple repetitive tasks, follow simple and moderately complex instructions, and make simple decisions in a static environment with minimal social interaction and without strict production or time demands on output.  *Id.*  Dr. Edwards documented affective disorders and personality disorders on his Psychiatric Review Technique, referencing bipolar syndrome, inflexible and maladaptive personality traits, and medically determinable impairments of Intermittent Explosive Disorder, Malingering, and Personality Disorder NOS.  (Tr. 476-489).  Dr. Edwards indicated that Plaintiff had a moderate degree of functional limitation, specifically with difficulties maintaining social functioning.  (Tr. 486).

Dr. Edwards also completed a case analysis on April 7, 2009.  (Tr. 499).  He indicated that Dr. Nigro's opinion, finding that Plaintiff had a "poor" ability to tolerate stress was not supported by the medical evidence on record or by Plaintiff's activities of daily living.  *Id*.  Dr. Edwards specifically cited evidence to support his opinion, including Plaintiff's maintenance of a relationship with his girlfriend, helping with his children, and completing all of the consultative examiner's tasks without decompensation.  *Id*.

W. Jerry McCloud, M.D. completed a Physical Residual Functional Capacity Assessment on April 3, 2009, for the BDD.  (Tr. 490-497).  Dr. McCloud indicated that there were no treating source opinions to weigh regarding Plaintiff's physical functioning, as there was not a medical source statement in the file at that time.  (Tr. 495-496).  Dr. McCloud opined that Plaintiff could occasionally lift or carry 20 pounds; frequently lift and carry 10 pounds; stand or walk for about six hours in an eight hour workday; and sit for about six hours in an eight hour workday.  (Tr. 491).  Dr. McCloud found no limitations on Plaintiff's capability to push or pull. *Id*.  Dr. McCloud opined that Plaintiff's postural limitations included occasional climbing of ladders, ropes, and scaffolds and the need to avoid hazards in the environment.  (Tr. 492, 494). Dr. McCloud further opined that Plaintiff's statements appeared consistent in nature, but not in severity with the medical evidence of record in the file.  (Tr. 495).  Dr. McCloud specifically referenced a range of examples, including Noble's report of a heart problem that conflicted with evidence which showed normal heart functioning.  *Id*.  Also, Plaintiff reported problems with balance at times due to recent foot surgery; however, records generally showed normal x-rays, normal ranges of motion, and did not support a significant loss of ability to balance or the need for an ambulatory aid.  *Id*.  And, while Plaintiff complained of back pain, he did not display any overt symptoms of pain during evaluation.  *Id*.

On May 27, 2009, Noble was brought to Fairview Hospital for emergency care due to suicidal ideation and self-inflicted wounds.  (Tr. 591-615).  He had three wounds: a superficial slice to his neck and two punctures to his abdomen, approximately 0.5 cm in size.  (Tr. 591).  His alcohol level was mildly elevated.  *Id*.  He was transferred to Lakewood Hospital for psychiatric hospitalization.  (Tr.592, 509).  At Lakewood Hospital, Plaintiff reported that the incident began with a fight with his girlfriend.  (Tr. 507, 509).  He indicated that he drank almost daily, was more irritable, depressed and angry lately, and did not take his medication the day of the fight.  (Tr. 509, 511).  Noble denied any suicidal ideation and explained that he did not want to hurt himself, he just wanted his girlfriend to stop yelling and to listen to him.  *Id*.  The evaluation completed at Lakewood Hospital states that Plaintiff voiced his feelings of hopelessness, anger and disappointment and was focused extensively on his somatic concerns.  (Tr. 509-510).  The evaluation also indicated that Plaintiff's memory, attention, and concentration were intact, though his insight and judgment were questionable.  *Id*.  An occupational therapy evaluation dated May 27, 2009, revealed impairments in problem-solving, generalization of learning, coping skills, follow-through, social skills, and self-esteem.  (Tr. 511).  Activities of daily living were assessed as independent.  (Tr. 512).  Plaintiff's medications were adjusted and he was discharged the next day due to improvements.  (Tr. 510, 513).

Tasneem Khan, Ed.D. completed a case analysis for BDD on July 16, 2009.  (Tr. 528). She indicated that she could not affirm the prior Psychiatric Review Technique form or Mental Residual Functioning Capacity which Dr. Edwards completed, because they did not reflect appropriate limitations as a result of Plaintiff's recent psychiatric hospitalization and episode of decompensation.  *Id*.  Thus, Mel Zwissler, Ph.D. completed an updated Psychiatric Review Technique form and Mental Residual Functioning Capacity on August 9, 2009.  (Tr. 531-548).

The updated forms were identical to the previous versions save the addition of one episode of decompensation and a statement regarding Plaintiff's hospital stay for depression, alcohol, and self-cutting, with improvement upon discharge.  (Tr. 541, 547).

On September 3, 2009, Willa Caldwell, M.D. reviewed Plaintiff's file for BDD.  (Tr. 549).  Her case analysis indicated Plaintiff had the residual functional capacity to perform light work with postural limitations.  *Id*.  Dr. Caldwell addressed Plaintiff's report of worsening pain as of April 2009, yet determined that the medical evidence of record did not document a condition that had worsened.  *Id*.  Dr. Caldwell affirmed Dr. McCloud's initial assessment.  *Id*.

In June 2010, Dr. Nigro completed a Medical Source's Statement of Plaintiff's mental capacity.  (Tr. 570-571).  He opined that Noble had a poor ability to follow work rules; maintain attention and concentration for extended periods of two hour segments; maintain regular attendance and be punctual within customary tolerance; relate to coworkers; interact with supervisors; function independently without special supervision; work in coordination with or proximity to others without being unduly distracted or distracting; deal with work stress; complete a normal workday and work week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out detailed, but not complex job instructions; behave in an emotionally stable manner; relate predictably in social situations; and manage funds/schedules.  *Id*.

During that same month, Dr. Celeste completed a statement of Plaintiff's physical capacity.  (Tr. 568-569).  Dr. Celeste indicated that Noble was limited within an eight hour day to standing or walking for four hours, with two hours uninterrupted.  *Id*.  Dr. Celeste opined that Plaintiff could sit for a half hour without interruption, for a total of two hours.  *Id*.  Dr. Celeste

also indicated that Plaintiff could rarely climb, stoop, crouch, kneel, crawl, push, pull, and use fine manipulation.  *Id*.  Noble was limited to occasional balancing, handling, and gross manipulating, and precluded from working around heights, moving machinery, temperature extremes, chemicals, noise, and fumes.  *Id*.  Dr. Celeste indicated that burns on Plaintiff's body caused pain that would interfere with an eight hour work day.  (Tr. 569).  Dr. Celeste stated his findings were supported by Noble's "P.E. history."  (568-569).

### III.  HEARING TESTIMONY

At the hearing, Noble testified that he has had difficulty getting along with others since the apartment fire.  (Tr. 41)  As a result, he was fired five or six times due to problems dealing with people and getting in arguments and altercations.  (Tr. 41-42).  He has also been arrested several times due to anger.  (Tr. 45).  Noble testified that he has flashbacks of the fire, trouble sleeping, and forgets to do things.  (Tr. 42-43).  He reported pain in his back, neck, legs, feet, and hands due to nerve damage which was aggravated by being on his feet too long, bending over, and twisting.  (Tr. 46-47).  He testified that he bleeds easily when his skin breaks from scarring. (Tr. 56).  Noble stated that medications take the pain away for a couple of hours, but make him "zombiefied," tired, and prevent him from falling asleep.  (Tr. 47-48, 57).  Noble testified that he was "doing nothing" when he lived with his girlfriend and kids.  (Tr. 49).  But, he later admitted that he changed diapers and occasionally took the children places when accompanied by other people.  (Tr. 50).  Noble also admitted that he launders his clothing, prepares his own meals, vacuums, washes dishes, cares for his own personal hygiene, and is capable of using public transportation.  (Tr. 50, 52-56).

### IV.  ALJ's DECISION

The ALJ made the following relevant findings of fact and conclusions of law:

. . .

2.      The claimant has not engaged in substantial gainful activity since September 5, 2007.

3.      The claimant has the following serve impairments: a history of burns on the body with residual scarring, history of a hammer toe subsequently repaired, bipolar disorder, personality disorder, post traumatic stress disorder (PTSD), and a history of substance abuse.

4.      The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. 404, Subpart P, Appendix 1.

5.      After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a range of light work.  The claimant is able: to lift and/or carry, and push/pull 20 pounds occasionally and 10 pounds frequently; sit for a total of eight hours out of an eight hour day; stand and/or walk for a total of six hours out of an eight hour day for up to two hours at a time with normal breaks; frequently climb ramps or stairs; no more than occasionally climb ladders; occasionally balance; frequently stoop, kneel, and crouch; with no significant limitations regarding manipulation, visual acuity, or environmental limitations.  Mentally, he can perform simple, repetitive, routine tasks with no more than superficial contact with others including co-workers and the public.

6.      The claimant is unable to perform any past relevant work.

. . .

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from September 5, 2007, through the date of this decision.

(Tr. 15-16, 18, 22-23) (internal citations omitted).

## V.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Social Security

Income benefits only when he establishes disability within the meaning of the Social Security

Act.  *See* 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when he cannot perform

"substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months." *See* 20 C.F.R. §§ 404.1505, 416.905.

## VI.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether, based on the record as a whole, the Commissioner's decision is supported by substantial evidence, and whether, in making that decision, the Commissioner employed the proper legal standards. *See Cunningham v. Apfel*, 12 F. App'x 361, 362 (6th Cir. 2001); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984); *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, then that determination must be affirmed. *Id*.  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this Court would resolve the issues of fact in dispute differently or substantial evidence also supports the opposite conclusion. *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  This Court may not try this case de novo, resolve conflicts in the evidence, or decide questions of credibility. *See Garner*, 745 F.2d at 387.  However, it may examine all evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989).

## VII.  ANALYSIS

Plaintiff submits this case for reversal and/or remand on two grounds.  First, Noble claims that the ALJ erred in his analysis of the treating physicians' opinions.  Plaintiff asserts that there was not substantial evidence to support the ALJ's disregard of Dr. Celeste's and Dr. Nigro's opinions.  Second, Plaintiff asserts that the ALJ did not properly evaluate his pain under the appropriate standards.

### A.  Treating Physicians' Opinions

The Social Security Administration ("SSA") requires an ALJ to give a treating physician's opinion controlling weight when specific circumstances are present.  SSR 96-2p, 1996 WL 374188, at *1 (1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541 (6th Cir. 2004). The rationale for assigning a treating source's opinion controlling weight is that the treating source is likely to be the medical professional most capable of providing a detailed, longitudinal description of the claimant's impairment and may have an unique perspective that cannot be deduced from the objective medical findings and reports alone.  *Wilson*, 378 F.3d at 544. However, controlling weight may only be given to a treating source's opinion if it is (1) "well-supported by medically acceptable clinical and laboratory diagnostic techniques," and (2) "not inconsistent with the other substantial evidence in the case record."  SSR 96-2p, at *1; *Wilson*, 378 F.3d at 544.  If the ALJ determines that these elements are not met, the ALJ must determine the appropriate weight to assign to the opinion by applying factors set forth in 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2).[6]  These factors require the ALJ to consider the length of the treatment relationship, including the frequency of examinations; nature and extent of the treating

---

[6]  As of March 36, 2012 sections 404.1527 and 416.927 of the Code of Federal Regulations were amended.  Paragraph (d) of each section was redesignated as paragraph (c). *See* 77 F.R. 10651-01, 2011 WL 7404303.

relationship, such as the examinations and testing the source has performed and ordered; medical evidence that supports the opinion; consistency with the record as a whole; specialization of the source; and other factors brought to the ALJ's attention.  *Id*.

When an ALJ does not assign a treating source controlling weight, his decision must include "good reasons" for the weight assigned to the opinion.  SSR  96-2p, at *5; *Wilson*, 378 F.3d  at 544.  The reasons must be supported by evidence in the case record and be sufficiently clear to subsequent reviewers.  *Id*.   This procedure is meant to assist a claimant with understanding the disposition of his case.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007). This is especially important where "a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that [he] is not, unless some reason for the agency's decision is supplied.'" *Id*. (quoting *Wilson*, 378 F.3d at 544.).   In addition, the "good reasons" explanation is intended to ensure that the ALJ applies the treating physician rule and to permit meaningful appellate review.  *Id*. at 243.  If the ALJ fails to adhere to these regulations, remand may be necessary, even when there is substantial evidence to otherwise support the Commissioner's decision.  *Wilson*, 378 F.3d at 544-545.

<u>Dr. Celeste: Physical Impairments</u>

In the present case, Plaintiff asserts that the ALJ improperly weighed Dr. Celeste's opinion.  Plaintiff argues that the ALJ gave Dr. Celeste's opinion "little or no weight" without a substantial basis.  The undersigned disagrees.

The ALJ was required to assign Dr. Celeste's opinion controlling weight only if his opinion was well-supported by the clinical and laboratory medical techniques and consistent with the medical evidence in the record, which it was not.  *See* SSR  96-2p, at *1; *Wilson*, 378 F.3d at 544.  The ALJ explained in his decision that Dr. Celeste's opinion limited Plaintiff to less than

sedentary work. (Tr. 20, 568-569).  However, the ALJ determined that the limitations announced were not supported or identified in the doctor's own treatment records.  (Tr. 20).  In addition, the ALJ pointed out that Dr. Celeste's only rationale for the limitations was Plaintiff's "history of burns," which was inconsistent with Dr. Celeste's own treatment records and other medical evidence which indicated that Noble's burns were healed and that his pain was responsive to medication.  (Tr. 20, 569, 438).  Also, the ALJ discussed the inconsistencies between Dr. Celeste's findings and Plaintiff's daily activities, such as doing laundry and vacuuming.  (Tr. 20).  Although Plaintiff argues that the ALJ did not quantify his daily living activities, the SSA regulations do not require such detail and the activities reported by Plaintiff inherently require more activity than sedentary work demands.

Since the ALJ was unable to find that the requirements for controlling weight were shown, he properly evaluated Dr. Celeste's opinion and provided adequate reasons for assigning it "little weight."  (Tr. 20).  In addition to noting the inconsistencies between the doctor's findings and Plaintiff's functional abilities, the ALJ looked to the state agency physician's reports and deemed that their opinions were "consistent with the objective medical evidence of record, [the] limited treatment history and the claimant's acknowledged activities."  (Tr. 20).  Both state agency physicians, Dr. McCloud and Dr. Caldwell, opined that Plaintiff could perform light work, contrary to Dr. Celeste's opinion.  (Tr. 495, 549).  Dr. Caldwell also specifically discounted Plaintiff's claim that his pain had increased, noting that the medical evidence did not reveal any worsening of his conditions to support such a claim.  (Tr. 549).

Plaintiff also argues that the ALJ erred by concluding that his medications worked well and noting that no further aggressive treatment has been prescribed.  Plaintiff claims that the severe burns he suffered are objective evidence of his pain and that no physician had prescribed

any treatment to cure his scarring. However, the ALJ appropriately pointed out that the record showed that Noble's burns were well-healed. (Tr. 19). And, as further discussed below, the ALJ provided sufficient reasons for discounting Plaintiff's claims regarding the severity of his pain resulting from any residual scarring.

Dr. Nigro: Mental Impairments

Plaintiff maintains that the ALJ improperly cherry-picked Dr. Nigro's findings and erroneously gave the doctor's opinion no weight. Dr. Nigro opined Plaintiff retained a poor ability to perform many of the mental functions instrumental to maintaining employment. The ALJ held Dr. Nigro's findings were not deserving of controlling weight because his "records were inconsistent and unsupportive of such significant mental limitations." (Tr. 20). Thus, Dr. Nigro's opinion was not entitled to controlling weight under *Wilson*.

The ALJ supplied "good reasons" for disregarding Dr. Nigro's opinion. To begin, the ALJ found that Dr. Nigro failed to explain why he concluded that Plaintiff's ability to maintain attention and concentration was poor, when the doctor had previously concluded that Noble's abilities in these areas were adequate. The undersigned notes that neither Dr. Nigro nor Plaintiff identified any specific event or reason justifying such a dramatic change in Dr. Nigro's finding. (Tr. 446, 449, 717-720).[7] The ALJ also noted that Dr. Nigro had assessed Plaintiff's GAF score at 60, suggestive of only mild to moderate limitations. In addition, the ALJ highlighted that Dr. Nigro's treatment notes reflected that Plaintiff's condition had improved with treatment and was stable.

Furthermore, the ALJ relied upon the findings of the state agency psychologists who opined that Noble's ability to maintain concentration, persistence and pace was only mildly

[7] Dr. Nigro's records are largely illegible. However, neither party has raised this issue as a concern. Therefore, the undersigned declines to address it *sua sponte*.

impaired.  Although Dr. Nigro's treatment notes contain differing accounts of Plaintiff's mental health, at times described as stable, and other times as unstable, the ALJ was responsible for assessing Plaintiff's ultimate mental residual functional capacity. Therefore, due to the noted inconsistencies within Dr. Nigro's opinion, it was reasonable for the ALJ to look to the state agency psychologist's opinion in order to assess Plaintiff's mental functionality.

Finally, Plaintiff contends that the ALJ erred in relying on Dr. Nigro's assessment of his GAF score of 60.  Plaintiff argues that because Dr. Nigro's assessments indicated GAF scores ranging from 50 to 60, they were indicative of severe symptoms, and did not reveal that Noble was stable and improving, as the ALJ determined.  The undersigned finds that the ALJ did not exclusively rely on the GAF score, as it was only one example that the ALJ referenced to determine that Plaintiff's mental impairments were less severe than Dr. Nigro opined.

GAF scores are subjective determinations of the claimant's overall functioning level. American Psychological Association, *Diagnostic & Statistical Manual of Mental Disorders* (DSM-IV-TR) 34 (4th ed., text rev. 2000); *DeBoard v. Comm'r of Soc. Sec.*, 211 F. App'x 411, 415 (6th Cir. 2006).  Even if the ALJ had relied upon Dr. Nigro's GAF score of 50, it would not have necessarily caused the ALJ to find Plaintiff disabled.  As the Sixth Circuit stated, "we are not aware of any statutory, regulatory, or other authority requiring the ALJ to put stock in a GAF score."  *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. 2006).  Therefore, Plaintiff's GAF scores were not determinative of the ALJ's ultimate ruling, and therefore any arguable error committed by the ALJ in considering this evidence was harmless.

### B. <u>Evaluation of Pain</u>

Noble asserts that the ALJ erred in evaluating his pain.  "An ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when

making a determination of disability." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525 (6th Cir. 1997)). Yet, the ALJ's credibility findings must be supported by substantial evidence and are entitled to great deference. *Walters*, 127 F.3d at 531. Additionally, the ALJ's credibility determination must include specific reasons, from evidence in the case record, for the assigned weight. SSR 96-7p, at *2; *Felisky v. Bowen*, 35 F.3d 1027, 1036 (6th Cir. 1994).

In evaluating claims of disabling pain, the ALJ must first determine if there is an underlying medical condition that could be reasonably expected to give rise to the alleged pain. 20 C.F.R. §§ 404.1529(a), 416.929(a); SSR 96-7p, at *1; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). Once this is determined, the ALJ must evaluate the intensity, persistence and limiting effects of the pain. 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ shall consider information about the individual's history, laboratory findings, prior work record, statements about his symptoms, evidence submitted by treating and nontreating sources, as well as observations by other individuals. *Id*.

The ALJ must also consider the following factors:

(1)     The individual's daily activities;

(2)     The location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3)     Factors that precipitate and aggravate the symptoms;

(4)     The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5)     Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6)     Any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and

(7)    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, at *3; *See Felisky*, 35 F.3d at 1038.

In this case, the ALJ found that Plaintiff had a history of burns on the body with residual scarring, a history of a hammer toe subsequently repaired, bipolar disorder, personality disorder, post traumatic stress disorder, and a history of substance abuse.  (Tr. 15).  The ALJ held that these impairments could reasonably be expected to cause alleged symptoms, but not of the intensity, persistence, and limiting effects alleged by Plaintiff.  (Tr. 18).  Instead, the ALJ found that Plaintiff's alleged pain was "inconsistent with the objective medical evidence of record, [his] treatment history and the claimant's acknowledged activities."  (Tr. 18).  The ALJ supported his determination with specific explanations and references to the record.  (Tr. 19).  For example, the ALJ refuted the degree of Plaintiff's limitation from his scarring based on the lack of evidence in the record supporting Plaintiff's claims of cracking and bleeding skin, difficulty grasping and holding, and medical reports of well-healed skill grafts.  *Id*.  In determining that Noble's back pain as not disabling, the ALJ cited evidence of imaging reports with insignificant results, examinations showing no observed pain, and documents evidencing intact senses, good ranges of motion, no problems with ambulation.  *Id*.  The ALJ also noted that Plaintiff's hammertoe was repaired through corrective surgery and x-rays of his foot did not show evidence of a significant abnormality.  *Id*.

Additionally, the ALJ referenced inconsistencies in the record which adversely affected Plaintiff's overall credibility.  (Tr. 19).  The ALJ described Plaintiff's statements to treating and examining sources as inaccurate and/or evasive.  *Id*.  The ALJ noted examiners' reports of vagueness in Plaintiff's explanation of daily living, examiners' questioning of malingering; and Noble's inconsistent testimony regarding the ages of his children.

The ALJ also provided a sufficient analysis of the *Felisky* factors.  The ALJ pointed out that Plaintiff testified that he was unable to pick up and carry objects weighing even ten pounds or to perform household chores.  However, this testimony was contradicted by Noble's admission that he took care of his two younger children at times, vacuumed, laundered clothing, cared for his own hygiene, and was capable of taking public transportation. (Tr. 16, 19).  Based on this evidence, the ALJ reasonably determined that Plaintiff was only mildly restricted in activities of daily living.  (Tr. 16).  The ALJ also held that there were no records supporting the frequency or severity of Plaintiff's claim of debilitating pain and regularly cracking and bleeding feet.  (Tr. 19-20).  Further, the ALJ discussed the positive effects of medication on Plaintiff's pain, as reported in several places in the record, and that no more aggressive treatment was prescribed.  (Tr. 19-20).  He also stated that there was no indication that Plaintiff's foot surgery was less than successful.  (Tr. 19).  These reasons are supported by the record.

## VIII.  DECISION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the Court **AFFIRMS** the decision of the Commissioner.

> s/ Kenneth S. McHargh
> Kenneth S. McHargh
> United States Magistrate Judge

Date: August 15, 2013.